AUSAs: Benjamin Levander, Timothy Ly

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>SHAILESHKUMAR GOYANI,<br>BRIJESHKUMAR PATEL,<br>  a/k/a "Samir,"<br>HIRENKUMAR PATEL,<br>NAINESHKUMAR PATEL,<br>NILESHKUMAR PATEL,<br>RAJU PATEL,<br>  a/k/a "Jay,"<br><br>Defendants. | **SEALED COMPLAINT**<br><br>Violations of 18 U.S.C. §§ 371, 1960, and 2<br><br>COUNTY OF OFFENSE:<br>WESTCHESTER<br><br>23mj6797 |

SOUTHERN DISTRICT OF NEW YORK, ss.:

LAWRENCE LONERGAN, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

## COUNT ONE
**(Conspiracy to Operate an Unlicensed Money Transmitting Business)**

1.     From at least in or about July 2021, through at least in or about September 2023, in the Southern District of New York and elsewhere, SHAILESHKUMAR GOYANI, BRIJESHKUMAR PATEL, a/k/a "Samir," HIRENKUMAR PATEL, NAINESHKUMAR PATEL, NILESHKUMAR PATEL, and RAJU PATEL, a/k/a "Jay," the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit an offense against the United States, to wit, the operation of an unlicensed money transmitting business charged in Count Two, in violation of Title 18, United States Code, Section 1960.

2.     It was a part and an object of the conspiracy that SHAILESHKUMAR GOYANI, BRIJESHKUMAR PATEL, a/k/a "Samir," HIRENKUMAR PATEL, NAINESHKUMAR PATEL, NILESHKUMAR PATEL, and RAJU PATEL, a/k/a "Jay," the defendants, and others known and unknown, would and did knowingly conduct, control, manage, supervise, direct, and own all and part of an unlicensed money transmitting business, which affected interstate and foreign commerce and (i) was operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under State law, to wit, New York, among other States; and (ii) failed to comply with the money transmitting business registration requirements under Section 5330 of Title 31, United States Code, and regulations prescribed under such section, in violation of Title 18, United States Code, Section 1960.

(Title 18, United States Code, Section 371.)

## COUNT TWO
### (Operation of an Unlicensed Money Transmitting Business)

3.      From at least in or about July 2021, through at least in or about September 2023, in the Southern District of New York and elsewhere, SHAILESHKUMAR GOYANI, BRIJESHKUMAR PATEL, a/k/a "Samir," HIRENKUMAR PATEL, NAINESHKUMAR PATEL, NILESHKUMAR PATEL, and RAJU PATEL, a/k/a "Jay,"  knowingly conducted, controlled, managed, supervised, directed, and owned all and part of an unlicensed money transmitting business, which affected interstate and foreign commerce, and aided and abetted the same, to wit, SHAILESHKUMAR GOYANI, BRIJESHKUMAR PATEL, a/k/a "Samir," HIRENKUMAR PATEL, NAINESHKUMAR PATEL, NILESHKUMAR PATEL, and RAJU PATEL, a/k/a "Jay,"  the defendants, transmitted money from, through and out of the United States, including money collected in the Southern District of New York, without an appropriate state license, which conduct was punishable as a misdemeanor under New York law, without meeting the Federal registration requirements set forth for money transmitting businesses, and knowing that the money derived from a criminal offense or was intended to be used to promote or support unlawful activity.

(Title 18, United States Code, Sections 1960(b)(1)(A), (b)(1)(B), and (b)(1)(C) and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

4.      I am a Special Agent with the FBI.  In that capacity, I have participated in numerous investigations into money laundering, fraud, and other complex financial offenses, and have spoken with other FBI agents and local law enforcement officers who personally participated in the investigation of this matter, along with other law enforcement agents.

5.      I make this Affidavit in part on personal knowledge based on my participation in the investigation; review of reports and other documents prepared by law enforcement agents and others; and physical surveillance.

6.      Throughout this Affidavit, where I assert that a statement was made, I was not the individual to whom the statement was made unless I specifically so state.  Rather, information about the statement was provided by someone else to whom I have spoken or whose reports I have read and reviewed.  Such statements are among many statements made by others and they are set forth in substance and in part, unless otherwise indicated.  Similarly, unless otherwise indicated, information in this Affidavit resulting from surveillance does not necessarily set forth my personal observations, but may have been provided to me by other law enforcement agents who observed the events, and to whom I have spoken or whose reports I have read.

7.      Furthermore, the facts and circumstances of this investigation have been summarized for the specific purposes of this Affidavit.  I have not attempted to set forth the complete factual history of this investigation or all of its details. In making this Affidavit, I rely only on the facts stated herein.

### The Dark Web and Cryptocurrency

8.      Based on my training, research, education, and experience, I am familiar with the following relevant terms and definitions:

a.      The "dark web" is a portion of the "deep web"[1] of the Internet, where individuals must use an anonymizing software or application called a "darknet" to access content and websites.  Within the dark web, criminal marketplaces operate, allowing individuals to buy and sell illegal items, such as drugs, firearms, and other hazardous materials, with greater anonymity than is possible on the traditional Internet (sometimes called the "clear web" or simply the "web").  These online market websites use a variety of technologies, including the Tor network (defined below) and other encryption technologies, to ensure that communications and transactions are shielded from interception and monitoring.  Famous dark web marketplaces, also called Hidden Services, such as Silk Road 1, Silk Road 2, AlphaBay, and Hansa (all of which have since been shut down by law enforcement), operated similarly to clear web commercial websites such as Amazon and eBay, but offered illicit goods and services.  When law enforcement shut down the four dark web marketplaces listed above, they also obtained images of their servers, and law enforcement has been able to mine the data from those sites for information about the customers and vendors who used them.

b.      "Vendors" are the dark web's sellers of goods and services, often of an illicit nature, and they do so through the creation and operation of "vendor accounts" on dark web marketplaces.  Customers, meanwhile, operate "customer accounts."  Vendor and customer accounts are not identified by numbers, but rather monikers or "handles," much like the username one would use on a clear web site.  If a moniker on a particular marketplace has not already been registered by another user, vendors and customers can use the same moniker across multiple marketplaces, and based on seller and customer reviews, can become well known as "trusted" vendors or customers.  It is also possible for the same person to operate multiple customer accounts and multiple vendor accounts at the same time.  For example, based on my training and experience, I know that one person could have a vendor account that he or she uses to sell illegal goods on a dark web marketplace in exchange for cryptocurrency; that same vendor could also have a different customer account that he or she uses to exchange cryptocurrency earned from vendor sales for fiat currency.[2]  Because they are separate accounts, a person could use different accounts to send and receive the same cryptocurrency on the dark web.  I know from training and experience that one of the reasons dark web vendors have multiple monikers for different vendor and customer accounts, is to prevent law enforcement from identifying which accounts belong to the same person, and who the actual person is that owns or uses the accounts.

c.      I am aware that some dark net marketplace vendors conduct the entirety of their transactions on the dark web marketplace.  Other vendors use the sites as an advertising base

---

[1] The deep web is the portion of the Internet not indexed by search engines. Examples of the deep web are databases and internal networks belonging to private industry, government agencies, or academic institutions.

[2] Fiat currency is currency created and regulated by a government such as the U.S. Dollar, Euro, or Japanese Yen.

and messaging system and conduct their financial business via peer-to-peer[3] transactions in order to avoid using third-party escrow systems that they believe could be subject to law enforcement seizures, as well as thefts, hacks, and scams.

d.    The "Tor network," or simply "Tor" (an abbreviation for "The Onion Router"), is a special network of computers on the Internet, distributed around the world, designed to conceal the true Internet Protocol ("IP") addresses of the computers accessing the network, and, thereby, the locations and identities of the network's users.  Tor also enables websites to operate on the network in a way that conceals the true IP addresses of the computer servers hosting the websites, which are referred to as "hidden services" on the Tor network.  Such hidden services operating on Tor have complex web addresses, generated by a computer algorithm, ending in ".onion" and can only be accessed through specific web browser software, including a browser known as "Tor Browser," designed to access the Tor network.  Examples of hidden services websites are the aforementioned AlphaBay and Hansa.  Tor is available on cellphones using the Android and Apple operating systems by installing an application that puts a Tor-enabled internet browser on a user's cellphone, which then routes the phone's IP address through different servers all over the world, making it extremely difficult to track.

e.    Cryptocurrency, a type of virtual currency, is a decentralized, peer-to-peer, network-based medium of value or exchange that may be used as a substitute for fiat currency to buy goods or services or exchanged for fiat currency or other cryptocurrencies.  Examples of cryptocurrency are Bitcoin, Litecoin, and Ether.  Cryptocurrency can exist digitally on the Internet, in an electronic storage device, or in cloud-based servers.  Although not usually stored in any physical form, public and private keys (described below) used to transfer cryptocurrency from one person or place to another can be printed or written on a piece of paper or other tangible object.  Cryptocurrency can be exchanged directly from person to person, through a cryptocurrency exchange, or through other intermediaries.  Generally, cryptocurrency is not issued by any government, bank, or company; it is instead generated and controlled through computer software operating on a decentralized peer-to-peer network.  Most cryptocurrencies have a "blockchain," which is a distributed public ledger, run by the decentralized network, containing an immutable and historical record of every transaction.[4]  Cryptocurrency is not illegal in the United States.

f.    Bitcoin[5] is a type of cryptocurrency.  Payments or transfers of value made with bitcoin are recorded in the Bitcoin blockchain and thus are not maintained by any single administrator or entity.  As mentioned above, individuals can acquire bitcoin through exchanges (i.e., online companies which allow individuals to purchase or sell cryptocurrencies in exchange for fiat currencies or other cryptocurrencies), bitcoin ATMs, or directly from other people.  Individuals can also acquire cryptocurrencies by "mining."  An individual can "mine" bitcoins by using his/her computing power to solve a complicated algorithm and verify and record payments on the blockchain.  Individuals are rewarded for this task by receiving newly created units of a

---

[3] A "peer-to-peer" transaction is a direct transaction between two individuals without a third-party intermediary.

[4] Some cryptocurrencies operate on blockchains that are not public and operate in such a way to obfuscate transactions, making it difficult to trace or attribute transactions.

[5] Since Bitcoin is both a cryptocurrency and a protocol, capitalization differs.  Accepted practice is to use "Bitcoin" (singular with an uppercase letter B) to label the protocol, software, and community, and "bitcoin" (with a lowercase letter b) to label units of the cryptocurrency. That practice is adopted here.

cryptocurrency.  Individuals can send and receive cryptocurrencies online using many types of electronic devices, including laptop computers and smart phones.  Even though the public addresses of those engaging in cryptocurrency transactions are recorded on a blockchain, the identities of the individuals or entities behind the public addresses are not recorded on these public ledgers.  If, however, an individual or entity is linked to a public address, it may be possible to determine what transactions were conducted by that individual or entity.  Bitcoin transactions are therefore sometimes described as "pseudonymous," meaning that they are partially anonymous.  And while it's not completely anonymous, Bitcoin allows users to transfer funds more anonymously than would be possible through traditional banking and credit systems.

       g.     Cryptocurrency is stored in a virtual account called a wallet.  Wallets are software programs that interface with blockchains and generate and/or store public and private keys used to send and receive cryptocurrency.  A public key or address is akin to a bank account number, and a private key is akin to a PIN number or password that allows a user the ability to access and transfer value associated with the public address or key.  To conduct transactions on a blockchain, an individual must use the public address (or "public key") and the private address (or "private key").  A public address is represented as a case-sensitive string of letters and numbers, 26–35 characters long.  Each public address is controlled and/or accessed through the use of a unique corresponding private key—the cryptographic equivalent of a password or PIN—needed to access the address.  Only the holder of an address's private key can authorize any transfers of cryptocurrency from that address to another cryptocurrency address.

       h.     Although cryptocurrencies such as Bitcoin have legitimate uses, cryptocurrency is also used by individuals and organizations for criminal purposes such as money laundering and is an oft used means of payment for illegal goods and services on hidden services websites operating on the Tor network.  By maintaining multiple wallets, those who use cryptocurrency for illicit purposes can attempt to thwart law enforcement's efforts to track purchases within the dark web marketplaces.

       9.     Bitcoin "exchangers" and "exchanges" are individuals or companies that exchange bitcoin for other currencies, including U.S. dollars.  According to the Department of Treasury, Financial Crimes Enforcement Network ("FinCEN") Guidance issued on March 18, 2013, virtual currency administrators and exchangers, including an individual exchanger operating as a business, are considered money services businesses.[6]  Such exchanges and exchangers are required to register with FinCEN and have proper state licenses, as is required under New York state law.  From my training and experience, I know that registered money transmitters are required by law to follow Bank Secrecy Act anti-money laundering ("AML") regulations, "Know Your Customer" ("KYC") protocols, and other verification procedures similar to those employed by traditional financial institutions.  For example, FinCEN-registered cryptocurrency exchangers often require customers who want to open or maintain accounts on their exchange to provide their name, address, phone number, and/or the full bank account and routing numbers that the customer links to his/her exchange account.  As a result, there is significant market demand for illicit cryptocurrency-for-fiat currency exchangers, who not only lack AML or KYC protocols but often advertise their ability to offer customers stealth and anonymity.  These illicit exchangers often exchange fiat currency for

---

[6] See "Application of FinCEN's Regulations to Person Administering, Exchanging, or Using Virtual Currencies," available at https://www.fincen.gov/resources/statutes-regulations/ guidance/application-fincens-regulations-persons-administering.

cryptocurrencies, such as by meeting customers in person or by shipping fiat currency through the mail.  Due to the illicit nature of these transactions and their customers' desire for anonymity, such exchangers are frequently able to charge a higher exchange fee, often as high as 9-10%, in contrast to registered and BSA-compliant exchangers, who may charge fees as low as 1-2%.

Overview

10.    Based on my participation in this investigation, my conversations with other law enforcement officers, and my review of related law enforcement reports and records, I have learned that SHAILESHKUMAR GOYANI, BRIJESHKUMAR PATEL, a/k/a "Samir," HIRENKUMAR PATEL, NAINESHKUMAR PATEL, NILESHKUMAR PATEL, and RAJU PATEL, a/k/a "Jay," the defendants, are involved in operating an unlawful money transmitting business as detailed below, for which the defendants lacked a license.

The Defendants' Illegal Money Transmitting Business

11.    Based on my participation in this investigation, my conversations with other law enforcement officers, and my review of related law enforcement reports and records, I have learned that in or about April 2021, the FBI identified a vendor—a co-conspirator of the defendants ("CC-1")—going by a unique username on several darknet marketplaces and peer-to-peer exchanges.  CC-1 was offering a service to convert bitcoin or other cryptocurrency into cash— namely, to ship cash via U.S. Postal Service Express Mail or Priority Mail to customers within the United States in exchange for cryptocurrency.  The cryptocurrency payment to CC-1 would be composed of (i) the amount of cryptocurrency that the customer wanted to convert to cash and (ii) a fee for the cryptocurrency-to-cash conversion.[7]

12.    Based on my conversations with other law enforcement officers and my review of related law enforcement reports and records, I understand that in January 2023, an undercover officer ("UC-1") made contact with CC-1 via peer-to-peer messaging app and that CC-1 indicated to UC-1, in substance and in part, that at least some of his clients made money by selling drugs, that his wealthiest clients were hackers, and that he had made approximately $30 million over the prior three years through the exchange of cash for virtual currency.

13.    Based on my personal participation in this investigation, I learned that on or about February 7, 2023, law enforcement arrested an individual who had been mailing packages of cash on behalf of CC-1 from a post office in Westchester County, New York.  This individual became a confidential source ("CS-1").[8]

---

[7] In or about August 2023, CC-1 was charged by sealed indictment in the United States District Court for the Eastern District of Kentucky on charges of violating 18 U.S.C. §§ 1956(h) (money laundering conspiracy) and 371 (conspiracy to commit an offense against the United States).

[8] In or about February 2023, CS-1 was charged by sealed indictment in the United States District Court for the Eastern District of Kentucky on charges of violating 18 U.S.C. §§ 1956(h) (money laundering conspiracy) and 371 (conspiracy to commit an offense against the United States).  CS-1 has no prior criminal history and has been assisting the FBI in connection with this investigation in the hopes of receiving consideration at sentencing.  Detailed information provided by CS-1 has proven reliable and has been corroborated.

14.     As part of this investigation, I and other FBI agents have debriefed CS-1.  Based on my conversations with CS-1 and other law enforcement officers, my review of law enforcement reports regarding CS-1, and my review of related records, I understand that prior to his arrest, CS-1 had been packaging and shipping cash on behalf of CC-1 for approximately 18 months.  According to CS-1, the cash that CS-1 packed and mailed on behalf of CC-1 was delivered to him by various individuals.  CS-1 stated that he met the individuals approximately three times a week to receive cash in amounts typically ranging between $100,000 and $300,000 at a time, for the purpose of fulfilling cash shipment orders to CC-1's online cryptocurrency-to-cash customers.

15.     Based on my participation in several of the controlled pick-ups, my conversations with CS-1 and with law enforcement officers, and my review of communications made using the messaging service WhatsApp and toll records, I have learned that the typical transaction proceeded as follows:

a.     The Note:  Prior to an exchange, CC-1, using a unique Telegram[9] account handle,[10] would message CS-1 requesting that CS-1 send to CC-1 a picture of a "note" for pickup.  The "note" is a U.S. bank note.  CS-1 would then take a picture of a $1 or $5 bill in his possession and send the picture to CC-1's Telegram account.

b.     The Setup:  Later, a WhatsApp user would contact CS-1 to set up an in-person cash exchange by messaging CS-1 via WhatsApp (i) the serial number from the bill that CS-1 had photographed and messaged to CC-1 and (ii) in-person exchange details, such as the time of the exchange and the amount of cash to be exchanged.

c.     The Delivery:  During the in-person cash exchange, CS-1 would provide the original bill with matching serial number to the individual delivering cash.  Later, after receiving cash through the above-described in-person cash exchanges, CS-1 would pack and mail the cash to CC-1's online customers, fulfilling the cryptocurrency-to-cash exchange.

16.     Based on my training and experience, I know that in order to operate anonymously, cyber-criminal actors frequently utilize tradecraft and coded messages to positively identify themselves and their co-conspirators to one another without providing much personally identifying information, and to verify the validity of their communications and activity.  It is likely that the dollar bill tradecraft described above uses the serial number as a means of three-way identification for CC-1, CS-1, and the various individuals who delivered cash to CS-1 on behalf of CC-1. The system relies on CC-1 and/or his intermediaries communicating with both parties conducting the cash exchange.

17.     Based on my personal participation in the investigation, my discussions with other law enforcement officers, and my review of reports and records in this case, I have learned that CS-1

---

[9] Telegram is a mobile messaging and file sharing application that uses security features (*e.g.*, end-to-end encryption, storing chat data across multiple data centers controlled by different legal entities in different jurisdictions, splitting decryption keys into parts and keeping the parts in different places, etc.) that make it harder for law enforcement to discover illegal activity.  As a result, individuals who engage in illegal activity such as money laundering sometimes use Telegram.

[10] CS-1 identified the unique username referenced in paragraph 11 and the unique Telegram username referenced in paragraph 15(a) as usernames that are used by CC-1.

reviewed his WhatsApp contacts and conversations, and identified the WhatsApp accounts belonging to those responsible for arranging the cash exchanges. Beginning on or about February 10, 2023, CS-1 agreed to participate in controlled pick-ups of cash to help identify the persons who were delivering cash to CS-1 on behalf of CC-1. From February 10, 2023 through on or about September 27, 2023, CS-1, as part of his cooperation, arranged and participated in approximately 80 controlled pick-ups of cash totaling approximately $15,067,000. As set forth in greater detail below, the investigation has identified SHAILESHKUMAR GOYANI, BRIJESHKUMAR PATEL, a/k/a "Samir," HIRENKUMAR PATEL, NAINESHKUMAR PATEL, NILESHKUMAR PATEL, and RAJU PATEL, a/k/a "Jay," the defendants, as the individuals who delivered cash to CS-1 on behalf of CC-1.

<u>Defendants Collecting Cash</u>

18.     Based on my participation in this investigation, my conversations with others, including law enforcement officers and CS-1, and my review of related reports and records, including cellular location data, I have learned the following, in substance and in part:

        a.     Based on cellular location data, RAJU PATEL, a/k/a "Jay," the defendant, appears to have made frequent trips by car to locations both inside and outside the state of New York.[11] Specifically, between on or about May 13, 2023, and August 8, 2023, RAJU made approximately 30 trips to, among other locations, Boston Massachusetts (approximately 6 times); Pittsfield, Massachusetts (approximately 3 times); New York City, New York (approximately 4 times); cities in and around Pennsylvania (approximately 1 time); cities in and around New Jersey (approximately 9 times); and cities in and around Georgia (2 times). Additionally, NAINESHKUMAR PATEL and HIRENKUMAR PATEL made trips to and from South Carolina. For the reasons described further below, I believe these trips were made to collect cash that would be delivered to CS-1.

        b.     On multiple cash deliveries, the cash CS-1 received came in bags and/or paper bands with markings from various banks in regions where RAJU and others had travelled. For example, at least two cash deliveries were in bags that included the logo of East Boston Savings Bank; paper bands showed markings of regional banks, including First Keystone Community Bank in Pennsylvania; multiple branches of Truist Bank in Pennsylvania; the Fidelity Deposit and Discount Bank in Pennsylvania; a First National Bank branch in North Carolina; the Farmers & Merchants Bank of South Carolina; and the Bank of Travelers Rest South Carolina.

19.     Based on my participation in this investigation, my conversations with others, including law enforcement officers and CS-1, and my review of related reports and records, including cellular location data and video surveillance, I have learned the following, in substance and in part:

        a.     On or about June 14, 2023, RAJU PATEL, a/k/a "Jay," the defendant, left his residence in Queens, New York, at or about 6 a.m., and cellular location data indicated he traveled in a manner consistent with driving to Boston, Massachusetts. Along the way, he appeared to make

---

[11] Where referring to a particular defendant by one name, I use first names rather than surnames where the defendants share a surname. Accordingly, for example, RAJU PATEL, a/k/a "Jay," is "RAJU," and HIRENKUMAR PATEL is "HIRENKUMAR."

stops at several locations in Massachusetts. When he returned to his residence at or about 6:49 p.m., he walked into his residence carrying a large red-and-white colored bag.

   b. On June 16, 2023, at or about 10:31 p.m., RAJU left his apartment with a large red-and-white colored bag. Cellular location data indicated that RAJU then traveled in a manner consistent with driving to the vicinity of Ashburn, Georgia. At or about 6:09 a.m. on or about June 18, 2023, RAJU walked into his residence carrying a large red-and-white colored bag. By the time RAJU returned to his apartment on or about June 18, 2023, cellular location data indicated that he had traveled approximately 1,900 miles in less than 32 hours.

   c. On June 21, 2023, at or about 5:27 a.m., an unknown male ("Individual-1") departed from RAJU's residence carrying a large red-and-white colored bag. Cellular location data indicated that HIRENKUMAR PATEL, the defendant, arrived in the vicinity of RAJU's residence approximately 15 minutes later, and then traveled north to HIRENKUMAR's place of employment. Surveillance video shows HIRENKUMAR arrive at his place of employment with Individual-1.

   d. Later that morning, RAJU sent messages to CS-1 from a phone number ending in -8117. These messages informed CS-1 of a cash delivery that would occur later that day. Cellular location data indicates that HIRENKUMAR left his place of employment at or around 12:12 p.m. At or about shortly after 12:25 p.m., HIRENKUMAR[12] arrived at a meeting location and handed a red-and-white colored bag to CS-1. The bag contained approximately $250,000 in cash.

<u>Defendants' Deliveries of Cash</u>

  20. Based on my participation in this investigation, my conversations with others, including law enforcement officers and CS-1, and my review of related reports and records, I have learned that SHAILESHKUMAR GOYANI, BRIJESHKUMAR PATEL, a/k/a "Samir," HIRENKUMAR PATEL, NAINESHKUMAR PATEL, NILESHKUMAR PATEL, and RAJU PATEL, a/k/a "Jay," the defendants, participated in the delivery of cash to CS-1 on behalf of CC-1.

<u>RAJU PATEL, a/k/a "Jay," and HIRENKUMAR PATEL</u>

  21. Based on my participation in this investigation, my conversations with others, including law enforcement officers and CS-1, and my review of related reports and records, I have learned the following, in substance and in part:

   a. CS-1 identified the WhatsApp account associated with a phone number ending in -8117 as the most frequently involved in arranging in-person cash exchanges prior to CS-1's arrest. CS-1's cellphone identified the phone number ending in -8117 as being used by "Jay." During CS-1's 18 months of picking up cash to mail on behalf CC-1 prior to CS-1's arrest,

---

[12] Law enforcement confirmed that the person who delivered the cash was HIRENKUMAR based on a comparison of a photograph of the driver who delivered the cash with a photograph of HIRENKUMAR from the New York State Department of Motor Vehicles.

CS-1 had become familiar with Jay (both his physical appearance and through WhatsApp messages).  I understand that "Jay" was identified as RAJU PATEL, a/k/a "Jay," the defendant.[13]

      b.    Of the approximately 80 controlled pick-ups conducted as part of CS-1's cooperation with the investigation, RAJU PATEL participated in approximately 58 cash exchanges involving a total of approximately $10,848,285 in cash.[14]  Specifically, RAJU, delivered cash to CS-1 on approximately 15 occasions, totaling approximately $2,869,665, and RAJU coordinated the delivery of cash by others on approximately 43 occasions, totaling approximately $7,978,620.  Further, of the approximately 43 cash exchanges for which RAJU coordinated with CS-1 but did not personally deliver the cash, HIRENKUMAR PATEL, the defendant, delivered the cash on approximately 41 occasions, totaling $7,579,720.  Three of these controlled pick-ups—the March 6, 2023 pick-up, the June 29, 2023 pick-up, and the July 3, 2023 pick-up—are detailed below.

      c.    <u>The March 6, 2023 Exchange</u>.  Based on my participation in the surveillance, preparation, and debriefing for a controlled pick-up on or about March 6, 2023, my discussions with other law enforcement officers, and my review of reports and records, I know the following, in substance and in part:

      i.    On or about March 6, 2023, RAJU PATEL, a/k/a "Jay," the defendant, contacted CS-1 via WhatsApp message (pictured below), setting a meeting time of 12:15 p.m. the same day at a predetermined location to deliver $250,000 in cash to CS-1, and directing CS-1 to bring a $1 bank note with a serial number of D53973007C.  CS-1 had previously provided a photograph of a $1 bank note with that serial number to CC-1.

---

[13] Based on my participation in this investigation, my conversations with other law enforcement officers, my review of related records, and my training and experience, I understand that "Jay" was identified as a Facebook friend of HIRENKUMAR PATEL, a co-defendant, and that "Jay's" profile bore the name of RAJU PATEL, the defendant.  I further understand that the phone number ending in -8117, which is associated with "Jay's" WhatsApp account, was saved in the "Contacts" of HIRENKUMAR's phone as "Raju Bhai."  Based on my conversations with other law enforcement officers and my training and experience, I understand that "bhai" is the Hindi word for "brother."

[14] Based on my participation in the investigation and review of law enforcement reports, I understand that CS-1 recorded audio and/or video of 79 out of the 80 controlled pick-ups and that agents checked and debriefed CS-1 before and after the controlled pick-ups.



   ii.  Law enforcement agents conducted surveillance of RAJU, then saw RAJU depart from his apartment building on Kissena Boulevard, Flushing, New York, carrying an orange cloth bag (pictured below).  RAJU was driven to the location by an unknown male in a Honda Pilot.



iii.     CS-1 arrived at the predetermined location, in or near the northeast corner of the parking lot of a supermarket located on White Plains Road, Tarrytown, NY (the "Supermarket"). Thereafter, the Honda Pilot carrying RAJU arrived and parked next to CS-1. CS-1 exited his vehicle, stood at the Honda Pilot's passenger window, and recognized RAJU, known to CS-1 as "Jay," as the passenger.

iv.     CS-1 provided the $1 bank note with the serial number of D53973007C to RAJU. RAJU then handed CS-1 the orange cloth bag that RAJU had taken with him from his apartment building. CS-1 then departed the location and provided the orange bag to law enforcement agents. The contents of the bag were counted, revealing a total of approximately $249,715 (pictured below).[15]

 

d.     <u>The June 29, 2023 Exchange</u>. Based on my participation in the surveillance, preparation, and debriefing for a controlled pick-up on or about June 29, 2023, my discussions with other law enforcement officers, and my review of reports and records, I know the following, in substance and in part:

i.     On or about June 29, 2023, at approximately 5:29 a.m., an individual ("Individual-2") departed from an apartment on Kissena Boulevard, Flushing, New York, carrying a black bag. Individual-2 arrived for work at a deli on East Tremont Avenue, Bronx, NY (the "Deli") and carried the black bag inside the Deli.

ii.     Later that day, at approximately 10:41 a.m., RAJU PATEL, a/k/a "Jay," the defendant, arrived and parked in front of the Deli. RAJU exited his vehicle and entered a store on East Tremont Avenue, Bronx, NY (the "Store"), two doors down from the Deli. Approximately one minute later, RAJU exited the Store and entered the Deli.[16]     Approximately

---

[15] Although on most occasions the amount delivered to CS-1 exactly matched the amount stated in the WhatsApp message, the orange cloth bag at the March 6, 2023 exchange contained only approximately $249,715, despite RAJU PATEL having stated that the amount would be $250,000 via WhatsApp.

[16] Based on my participation in the investigation, my discussions with other law enforcement officers, my training and experience, and my observation of the two establishments, I understand that the Deli and the Store are jointly managed.

six minutes later, RAJU exited the Deli, now carrying the black bag that Individual-2 had brought to the Deli earlier that morning.  RAJU then re-entered his vehicle and departed.

    iii.  Just a few minutes later, at approximately 10:51 a.m., RAJU contacted CS-1 via WhatsApp message (pictured below), setting a meeting time of 11:15 a.m. or 11:30 a.m. that same day at a predetermined location.  RAJU had messaged CS-1 approximately one hour earlier indicating that there would be a delivery of $250,000 in cash to CS-1, and directing CS-1 to bring a $1 bank note with a serial number of F83120203E.  CS-1 had previously provided a photograph of a $1 bank note with that serial number to CC-1.



    iv.  CS-1 arrived at the predetermined location, at or near the parking lot of a store located on Boston Post Road, Port Chester, NY (the "Port Chester Store").  Thereafter, RAJU arrived in the same vehicle he had driven to the Deli, and RAJU parked near CS-1's vehicle. CS-1 exited his vehicle, stood at the passenger window of RAJU's vehicle, and recognized RAJU, known to CS-1 as "Jay."

    v.  CS-1 provided the $1 bank note with the serial number of F83120203E to RAJU.  RAJU then handed CS-1 the black bag that RAJU had picked up at the Deli.  CS-1 then departed the location and provided the black bag to law enforcement agents.  The contents of the bag (pictured below) were counted, revealing a total of approximately $249,900, plus one additional counterfeit $100 bank note.






     e.   <u>The July 3, 2023 Exchange</u>.  Based on my participation in the surveillance, preparation, and debriefing for a controlled pick-up on or about July 3, 2023, my discussions with other law enforcement officers, and my review of reports and records, I know the following, in substance and in part:

        i.   On or about July 3, 2023, RAJU PATEL, a/k/a "Jay," the defendant, contacted CS-1 via WhatsApp message (pictured below), setting a meeting time of 1:30 p.m. the same day at a predetermined location to deliver $250,000 in cash to CS-1, and directing CS-1 to bring a $1 bank note with a serial number of K51135263H.  CS-1 had previously provided a photograph of a $1 bank note with that serial number to CC-1.



      ii.      CS-1 arrived at the predetermined location, in or near the parking lot of the Port Chester Store.  Thereafter, HIRENKUMAR PATEL, the defendant, arrived in a black Dodge Caravan[17] and parked next to CS-1.  CS-1 exited his vehicle, stood at the Dodge Caravan's passenger window, and recognized HIRENKUMAR as the vehicle's only occupant.  CS-1 provided the $1 bank note with the serial number of K51135263H to HIRENKUMAR.  HIRENKUMAR then handed CS-1 a brown bag (pictured below).[18]

---

[17] Based on my participation in the investigation and review of law enforcement records, I am aware that the license plate of the Dodge Caravan is registered to HIRENKUMAR PATEL, the defendant.

[18] The images of HIRENKUMAR PATEL providing to CS-1 the brown bag with $250,000 in cash match images of HIRENKUMAR obtained from the New York Department of Motor Vehicles and from HIRENKUMAR's Facebook profile.



      iii.      CS-1 then departed the location and provided the brown bag to law enforcement agents.  The contents of the bag were counted, revealing a total of approximately $250,000 (pictured below).





BRIJESHKUMAR PATEL, a/k/a "Samir"

22.     Based on my participation in this investigation, my conversations with others, including law enforcement officers and CS-1, and my review of related reports and records, I have learned the following, in substance and in part:

a.     CS-1 identified the WhatsApp account associated with a phone number ending in -8208 as belonging to an individual known to CS-1 as "Samir."  During CS-1's 18 months of picking up cash to mail on behalf CC-1 prior to CS-1's arrest, CS-1 had become familiar with "Samir" (both his physical appearance and through WhatsApp messages).  I understand that "Samir" was identified as BRIJESHKUMAR PATEL, a/k/a "Samir," the defendant.[19]

b.     Of the approximately 80 controlled pick-ups conducted as part of CS-1's cooperation with the investigation, BRIJESHKUMAR participated in approximately 11 cash exchanges involving a total of approximately $2,162,705 in cash.  Specifically, BRIJESHKUMAR delivered cash to CS-1 on approximately 10 occasions, totaling approximately $1,902,705, and BRIJESHKUMAR coordinated the delivery of cash by others on approximately 1 occasion, totaling approximately $260,000.

c.     When BRIJESHKUMAR participated in cash deliveries to CS-1, BRIJESHKUMAR sometimes worked together with co-defendants and other known and unknown co-conspirators.  For example:

i.     On or about March 27, 2023, BRIJESHKUMAR delivered cash in the amount of $329,600 to CS-1 at or near the parking lot of the Supermarket, in an exchange that NAINESHKUMAR PATEL, the defendant, helped to coordinate via WhatsApp message.

ii.     On or about September 18, 2023, BRIJESHKUMAR coordinated the delivery of cash in the amount of $260,000 to CS-1, and NILESHKUMAR PATEL, the defendant, delivered the cash in the amount of $260,000 to CS-1 at or near the parking lot of the Port Chester Store.[20]

d.     On other occasions, BRIJESHKUMAR PATEL both coordinated with CS-1 and delivered the cash to CS-1 himself.  One of these controlled pick-ups—the April 28, 2023 pick-up—is detailed below.

f.     The April 28, 2023 Exchange.     Based on my participation in the surveillance, preparation, and debriefing for a controlled pick-up on or about April 28, 2023, my

---

[19] Based on my participation in the investigation and review of law enforcement reports, I understand that, among other methods of identification, images of BRIJESHKUMAR PATEL, a/k/a "Samir," recorded by CS-1 during in-person cash exchanges match images of BRIJESHKUMAR obtained from the Maryland Department of Motor Vehicles and from BRIJESHKUMAR's Facebook profile.

[20] In or around August 2023, BRIJESHKUMAR began using a new phone number ending in -7069, to communicate with CS-1.  On or about August 28, 2023, in connection with arranging a delivery of cash in the amount of $100,000 that same day, BRIJESHKUMAR sent a message to CS-1 from the new number and identified himself as "Samir."

discussions with other law enforcement officers, and my review of reports and records, I know the following, in substance and in part:

          i.        On or about April 28, 2023, BRIJESHKUMAR contacted CS-1 via WhatsApp message (pictured below), setting a meeting time of 6:15 p.m. the same day at a predetermined location to deliver $150,000 in cash to CS-1. BRIJESHKUMAR also stated, "Have token for you," a reference to the serial number of a $1 bank note in CS-1's possession, which would be used during the in-person money exchange.



          ii.       CS-1 arrived at the predetermined location, in or near the northern portion of the parking lot of the Supermarket. Thereafter, BRIJESHKUMAR arrived in a white sedan and parked next to CS-1. BRIJESHKUMAR exited his vehicle and passed CS-1 a black plastic bag through CS-1's opened passenger window (pictured below).



        iii.       CS-1 then departed the location and provided the black plastic bag to law enforcement agents.   The contents of the bag were counted, revealing a total of approximately $150,000 (pictured below).







NAINESHKUMAR PATEL

23.     Based on my participation in this investigation, my conversations with others, including law enforcement officers and CS-1, and my review of related reports and records, I have learned the following, in substance and in part:

a.     CS-1 identified the WhatsApp account associated with the phone number ending in -0035 as belonging to an individual known to CS-1 as "Nainesh Patel." I understand that "Nainesh Patel" was later identified as NAINESHKUMAR PATEL, the defendant.[21]

b.     Of the approximately 80 controlled pick-ups conducted as part of CS-1's cooperation with the investigation, NAINESHKUMAR participated in approximately 5 cash exchanges involving a total of approximately $1,453,750 in cash.     Specifically, NAINESHKUMAR delivered cash to CS-1 on approximately 4 occasions, totaling approximately $1,124,150, and NAINESHKUMAR coordinated the delivery of cash by others on approximately 1 occasion, totaling approximately $329,600.

c.     When NAINESHKUMAR participated in cash deliveries to CS-1, NAINESHKUMAR sometimes worked together with co-defendants and other known and unknown co-conspirators. For example, on or about March 25, 2023, NAINESHKUMAR and an unknown co-conspirator coordinated via WhatsApp message an exchange of cash to CS-1. On or about March 26, 2023, after CS-1 notified NAINESHKUMAR and the unknown co-conspirator that CS-1 was unavailable for a pick-up that day, the unknown co-conspirator informed CS-1 that NAINESHKUMAR no longer would be the person carrying out the delivery. Then, on or about March 27, 2023, BRIJESHKUMAR PATEL, a/k/a "Samir," the defendant, delivered the cash in the amount of $329,600 to CS-1 at or near the parking lot of the Supermarket.

d.     On other occasions, NAINESHKUMAR both coordinated with CS-1 and delivered the cash to CS-1 himself. One of these controlled pick-ups—the February 18, 2023 pick-up—is detailed below.

e.     The February 18, 2023 Exchange.     Based on my participation in the surveillance, preparation, and debriefing for a controlled pick-up on February 18, 2023, my discussions with other law enforcement officers, and my review of reports and records, I know the following, in substance and in part:

i.     On or about February 18, 2023, NAINESHKUMAR contacted CS-1 via WhatsApp message (pictured below), setting a meeting time of 11:45 a.m. the same day at a predetermined location to deliver $70,000 in cash to CS-1 and directing CS-1 to bring a $1 bank note with a serial number of L58104851C. CS-1 had previously provided a photograph of a $1 bank note with that serial number to CC-1.

---

[21] Based on my participation in the investigation and review of law enforcement reports, I understand that, among other methods of identification, images of NAINESHKUMAR recorded by CS-1 during in-person cash exchanges match images of NAINESHKUMAR obtained from the South Carolina Department of Motor Vehicles.



      ii.      An unknown male and NAINESHKUMAR arrived in a white Hyundai Tucson and parked at the predetermined location, in or near the northern portion of the parking lot of the Supermarket.  Thereafter, CS-1 arrived at the predetermined location and parked next to the Hyundai Tucson.[22]

      iii.      NAINESHKUMAR exited from the passenger side of the Hyundai Tucson and approached the driver's side window of CS-1's vehicle. CS-1 provided the $1 bank note with the serial number L58104851C. NAINESHKUMAR then passed CS-1 a white plastic bag through CS-1's open driver window (pictured below).

---

[22] Based on my participation in the investigation and review of law enforcement records, I am aware that the license plate of the Hyundai Tucson is registered to NAINESHKUMAR PATEL, the defendant.



       iv.      CS-1 then departed the location and provided the white plastic bag to law enforcement agents. The contents of the bag were counted, revealing a total of approximately $70,000 (pictured below).

  

<u>NILESHKUMAR PATEL</u>

24.     Based on my participation in this investigation, my conversations with others, including law enforcement officers and CS-1, and my review of related reports and records, I have learned the following, in substance and in part:

     a.     On or about June 6, 2023, CS-1 was contacted by an individual using a WhatsApp account associated with a phone number ending in -9942, with the profile name "Nilesh Patel," to arrange a delivery of cash. That individual has since been identified by law enforcement as NILESHKUMAR PATEL, the defendant.[23]

---

[23] Based on my participation in the investigation and review of law enforcement reports, I understand that, among other methods of identification, the phone number ending in -9942 used to contact CS-1 was registered to NILESHKUMAR PATEL, and images of NILESHKUMAR recorded by CS-1 during in-person cash exchanges match images of NILESHKUMAR obtained from the New York Department of Motor Vehicles.

b.      Of the approximately 80 controlled pick-ups conducted as part of CS-1's cooperation with the investigation, NILESHKUMAR participated in approximately 2 cash exchanges involving a total of approximately $370,010 in cash.[24]  For each of the cash exchanges in which NILESHKUMAR participated, NILESHKUMAR personally delivered the cash to CS-1. One of these controlled pick-ups—the June 7, 2023 pick-up—is detailed below.

c.      <u>The June 7, 2023 Exchange</u>.  Based on my participation in the surveillance, preparation, and debriefing for a controlled pick-up on or about June 7, 2023, my discussions with other law enforcement officers, and my review of reports and records, I know the following, in substance and in part:

i.      On or about June 7, 2023, NILESHKUMAR contacted CS-1 via WhatsApp message (pictured below), setting a meeting time of 11:30 a.m. the same day to deliver in cash to CS-1 at a predetermined location.[25]



ii.      CS-1 arrived at the predetermined location, in or near the northeast portion of the parking lot of the Supermarket.  Thereafter, NILESHKUMAR arrived in a black Audi A6 and parked next to CS-1.  NILESHKUMAR exited his vehicle and stood at the passenger

---

[24] Based on my conversations with CS-1, I understand that NILESHKUMAR had delivered cash multiple times to CS-1 prior to CS-1's arrest (*i.e.*, before law enforcement began conducting controlled pick-ups).
[25] NILESHKUMAR PATEL had originally contacted CS-1 the set up the same delivery one day earlier, but NILESHKUMAR postponed the exchange by one day after he was delayed by traffic conditions.

window of CS-1's vehicle (pictured below).  NILESHKUMAR orally provided CS-1 with a portion of a serial number for a $1 bank note, which serial number CS-1 had previously provided to CC-1.  CS-1 then handed NILESHKUMAR the $1 bank note with that serial number through the opened passenger window of CS-1's car.  NILESHKUMAR then handed CS-1 a black plastic bag through CS-1's opened passenger window and informed CS-1 that the black plastic bag contained $110,000.



       iii.       CS-1 then departed the location and provided the black plastic bag to law enforcement agents.  The contents of the bag were counted, revealing a total of approximately $110,010 (pictured below).

 

<u>SHAILESHKUMAR GOYANI</u>

25.      Based on my participation in this investigation, my conversations with others, including law enforcement officers and CS-1, and my review of related reports and records, I have learned the following, in substance and in part:

a.      Of the approximately 80 controlled pick-ups conducted as part of CS-1's cooperation with the investigation, an individual who has been identified by law enforcement agents as SHAILESHKUMAR GOYANI, the defendant, participated in approximately 2 cash exchanges involving a total of approximately $320,900 in cash.[26]  For each of the cash exchanges in which GOYANI participated, GOYANI personally delivered the cash to CS-1.  One of these controlled pick-ups—the August 6, 2023 pick-up—is detailed below.

b.      <u>The August 6, 2023 Exchange</u>.    Based on my participation in the surveillance, preparation, and debriefing for a controlled pick-up on or about August 6, 2023, my discussions with other law enforcement officers, and my review of reports and records, I know the following, in substance and in part:

i.      On or about August 6, 2023, CS-1 was contacted by an unknown individual ("Individual-3") who was using a WhatsApp account associated with the phone number ending in -9833.  Individual-3 requested that CS-1 call him "regarding payment delivery."  CS-1 and Individual-3 then conversed via WhatsApp message, during which conversation Individual-3 noted that he had to return to South Carolina.  CS-1 asked what bank note serial number would be used for the upcoming delivery, and Individual-3 responded, "I'm still waiting on token" and added that the amount of cash to be delivered would be $150,000.

ii.      Shortly thereafter, CS-1 was contacted via Telegram by CC-1.  CC-1 requested that CS-1 send a "Note for pick up," and CS-1 responded with an image of a $1 bank note with serial number L19905182E.  A few minutes later, Individual-3 forwarded a WhatsApp message to CS-1 stating: "1USD L 19905182 E."  Individual-3 thereafter sent a message to CS-1 indicating that a person would contact CS-1 from a number with a "201" area code and that that person was on his way to a predetermined delivery location.  CS-1 did not receive a message from the number with the "201" area code.  Instead, GOYANI, the defendant, called CS-1 from a phone with the number ending in -9431.  GOYANI informed CS-1 that he was on his way for the exchange, had a token (*i.e.*, the serial number of the bank note that CS-1 would need to provide), and would arrive at the predetermined location at 9:07 p.m.

iii.      CS-1 arrived and parked at the predetermined location, in or near the parking lot of the Port Chester Store.  Thereafter, GOYANI arrived in a white Nissan Rogue with New Jersey license plate registered to GOYANI.  GOYANI parked next to CS-1, exited his Nissan Rogue, and stood at the passenger window of CS-1's vehicle.  CS-1 provided GOYANI with the $1 bank note with serial number L19905182E, and GOYANI returned to his Nissan Rogue.  GOYANI then re-emerged from his vehicle holding a blue bag, which GOYANI handed to CS-1 through the opened passenger window of CS-1's vehicle (pictured below).  GOYANI stated that the contents of the blue bag held $114,000, and GOYANI requested that CS-1 write "114" on the $1 bank note that CS-1 had provided to GOYANI.

---

[26] Based on my participation in the investigation and review of law enforcement reports, I understand that, among other methods of identification, GOYANI drove a car registered in his name to one of the controlled pick-ups, and images of GOYANI recorded by CS-1 during in-person cash exchanges match images of GOYANI obtained GOYANI's Facebook account and from the New Jersey Motor Vehicle Commission.

 

       iv.       CS-1 then departed the location and provided the blue bag to law enforcement agents.  The contents of the bag were counted, revealing a total of approximately $114,000 (pictured below).

 



<u>The Defendants Are Not Registered or Licensed Money Transmitting Businesses</u>

26.     New York law requires anyone operating a money transmitting business to be licensed.  In particular, New York State Banking Law, section 641(1), provides, in part, "No person shall . . . engage in the business of receiving money for transmission or transmitting the same, without a license therefor obtained from the superintendent as provided in this article, nor shall any person engage in such business as an agent, except as an agent of a licensee or as agent of a payee . . ."  Under New State Banking Law, Section 650, engaging in money transmission without the required license is punishable as a misdemeanor and a felony.

27.     Based on my review of New York's publicly available database of licensed money transmitters, I have learned that at no time have SHAILESHKUMAR GOYANI, BRIJESHKUMAR PATEL, a/k/a "Samir," HIRENKUMAR PATEL, NAINESHKUMAR PATEL, NILESHKUMAR PATEL, and RAJU PATEL, a/k/a "Jay," the defendants, been licensed to operate a money transmitting business in New York.

28.     Under Federal law, money transmitting businesses must also be registered with the U.S. Department of Treasury.  This requirement is set forth in a series of statutes and regulations more fully set forth below:

      a.   Title 31, United States Code, section 5330(a)(1) provides that "[a]ny person who owns or controls a money transmitting business shall register the business (whether or not the business is licensed as a money transmitting business in any State) with the Secretary of the Treasury[.]"  Section 5330(d)(1), in turn, explains, in part, that the "term 'money transmitting business' means . . . (A) any . . . person who engages as a business in the transmission of funds, including any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system; (B) is required to file reports under section 5313; and (C) is not a depository institution (as defined in section 5313(g))."

      b.   Title 31, United States Code, Section 5313(a) provides that "[w]hen a domestic financial institution is involved in a transaction for the payment, receipt, or transfer of United States coins or currency . . . in an amount, denomination, or amount and denomination, or under circumstances the Secretary prescribes by regulation, the institution and any other participant in the transaction the Secretary may prescribe shall file a report on the transaction at the time and in the way the Secretary prescribes."  The term "financial institution" is defined in 31 U.S.C. § 5312(a)(2)(R) as "a licensed sender of money or any other person who engages as a business in the transmission of funds, including any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system."

      c.   Under the statutory scheme described above, the Secretary of the Treasury is given the authority to establish which individuals and entities are subject to 31

U.S.C. § 5330's registration requirement. 31 U.S.C. §§ 5313(a); 5330(a)(2) & (c)(1). These regulations are contained in the Code of Federal Regulations ("CFR"). In particular, 31 C.F.R. § 1022.380(a)(1) provides that "each money services business (whether or not licensed as a money services business by any State) must register with FinCEN [an agency within the U.S. Department of Treasury] . . . as required by 31 U.S.C. 5330[.]" 31 C.F.R. § 1010.100(ff) includes a "money transmitter" as a "money services business." The term "money transmitter" is, in turn, defined by 31 C.F.R. § 1010.100(ff)(5) to include "the acceptance of currency, funds, or other value that substitutes for currency from one person and the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means. 'Any means' includes, but is not limited to . . . an informal value transfer system; or . . . [a]ny other person engaged in the transfer of funds." Accordingly, the Treasury regulations establish that any person engaged in the transfer of funds is required to register with FinCEN.

29.     Financial institutions are required to conduct various monitoring and reporting activities, including the filing of currency transaction reports ("CTRs") and Suspicious Activity Reports ("SARs"). For instance, the filing of CTRs is mandated by 31 C.F.R. § 1010.311, which provides that "[e]ach financial institution . . . shall file a report of each deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to such financial institution which involves a transaction in currency of more than $10,000." This regulation applies to money services businesses as defined above. 31 C.F.R. § 1022.310. Likewise, "[e]very money services business . . . shall file with the Treasury Department, to the extent and in the manner required by this section, a report of any suspicious transaction relevant to a possible violation of law or regulation," also known as SARs. 31 C.F.R. § 1022.320(a)(1). By failing to register with FinCEN, a money transmitting business prevents the Treasury from ensuring that the business is properly filing CTRs and SARs. This has the effect of allowing an unregistered money transmitting business to operate as a shadow bank through which funds can pass without being subjected to the scrutiny that Congress has sought fit to impose upon the United States financial system.

30.     Based on my review of a publicly available database operated by the U.S. Department of Treasury, I have learned that at no point have SHAILESHKUMAR GOYANI, BRIJESHKUMAR PATEL, a/k/a "Samir," HIRENKUMAR PATEL, NAINESHKUMAR PATEL, NILESHKUMAR PATEL, and RAJU PATEL, a/k/a "Jay," the defendants, been registered with the Secretary of the Treasury or FinCEN as a money transmitting business as set forth in the statutes and regulations described above.

WHEREFORE, I respectfully request that warrants be issued for the arrests of SHAILESHKUMAR GOYANI, BRIJESHKUMAR PATEL, a/k/a "Samir," HIRENKUMAR PATEL, NAINESHKUMAR PATEL, NILESHKUMAR PATEL, and RAJU PATEL, a/k/a "Jay," the defendants, and that they be arrested, and imprisoned or bailed, as the case may be.

LAWRENCE LONERGAN
Special Agent
Federal Bureau of Investigation

Sworn to before me this 13th day of October, 2023.

THE HONORABLE ANDREW E. KRAUSE
United States Magistrate Judge
Southern District of New York